## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

*(Filed Electronically on January 3, 2022)*

| | | |
|---|---|---|
| JOHN ARNOLD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 15-1252 L |
| v. | ) | |
| | ) | Judge Armando O. Bonilla |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## THE UNITED STATES' OPPOSITION TO PLAINTIFFS' PETITION FOR REIMBURSEMENT OF ATTORNEYS' FEES AND EXPENSES

## Table of Contents

INTRODUCTION ................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.......................................... 4

      1.    NKCR and STB Proceedings.......................................... 4

      2.    Case Proceedings ........................................................ 5

      3.    Plaintiffs' Fees Petition................................................ 7

LEGAL BACKGROUND ................................................................................. 8

    I.    The URA Limits the United States' Obligation to Reimburse Plaintiffs to the Costs and Expenses Plaintiffs Actually Incurred............................................... 8

    II.    The Lodestar Serves As A "Useful Starting Point" For Evaluating The Reasonableness of Claimed Attorney Fees under the URA ................................. 17

ARGUMENT .................................................................................................. 18

    I.    Because Plaintiffs Have Not Actually Incurred Any Attorneys' Fees Under Their Attorney Representation Agreement, They Are Not Entitled to Reimbursement Under The URA.......................................... 19

    II.    The Amount Plaintiffs Seek as Reimbursement is Unreasonable ...................... 21

        A.    Plaintiffs calculate the lodestar using excessive rates.............................. 21

            1.    There is no dispute that any lodestar calculation should be based on local rates. .................................................... 22

            2.    Plaintiffs proffer hourly rates in excess of the Joplin market. ...... 23

            3.    The rates paid to St. Louis practitioners engaged in real estate litigation should constitute a ceiling on the rates for routine real estate litigation in the Joplin market. ........................ 24

        B.    Plaintiffs are only entitled to reimbursement for time reasonably expended on successful claims. .............................................. 27

            1.    Plaintiffs grossly overbill for pre-complaint work....................... 27

            2.    Time devoted to unsuccessful claims and efforts is not reimbursable................................................................ 29

            3.    Excessive and duplicative hours should be eliminated................ 31

4.   Wasteful and unnecessary hours should be eliminated................. 32

5.   Administrative work is not reimbursable...................................... 34

6.   "Fees on fees" claims should be reduced..................................... 36

7.   Summary of reductions ................................................................ 37

C.   Plaintiffs are not entitled to reimbursement for unreasonable
expenses. ........................................................................................... 37

1.   Plaintiffs have failed to substantiate claimed expenses. ............... 37

2.   Unnecessary expenses are not reimbursable................................. 38

3.   Plaintiffs' expenses should also be reduced for unsuccessful
claims. ......................................................................................... 38

D.   Plaintiffs' limited degree of success warrants an additional reduction
of plaintiffs' fees. .................................................................................... 38

CONCLUSION ..................................................................................................... 40

## Table of Authorities

**Cases**

*Abraham Lincoln Mem'l Hosp. v. Sebelius*,
  698 F.3d 536 (7th Cir. 2012) .................................................. 16

*Arnold v. United States*,
  2022 WL 14198936 (Oct. 24, 2022).................................. 2, 6, 7, 13, 20, 22, 23, 25

*Avera v. Sec'y of Health & Human Servs.*,
  515 F.3d 1343 (Fed. Cir. 2008) ................................................ 22

*Bess v. Bess*,
  929 F.2d 1332 (8th Cir. 1991) ............................................. 13, 14

*Biery v. United States*,
  818 F.3d 704 (Fed. Cir. 2016) ................................................ 29

*Biery v. United States*,
  Nos. 07-693L, 07-675L, 2014 WL 12540517 (Fed. Cl. Jan. 24, 2014) ................... 35

*Blanchard v. Bergeron*,
  489 U.S. 87 (1989)........................................................... 13

*Blum v. Stenson*,
  465 U.S. 886 (1984).......................................................... 22

*Bowers v. Baystate Technologies, Inc.*,
  320 F.3d 1317 (Fed. Cir. 2003) ............................................... 20

*Bratcher v. United States*,
  136 Fed. Cl. 786 (2018) .................................................. 29, 35

*Bywaters v. United States*,
  670 F.3d 1221 (Fed. Cir. 2012) ........................................ 8, 16, 17, 40

*Bywaters v. United States*,
  684 F.3d 1295 (Fed. Cir. 2012) ............................................... 21

*Campbell v. United States*,
  138 Fed. Cl. 65 (2018) ....................................................... 27

*City of Burlington v. Dague*,
  505 U.S. 557 (1992).......................................................... 16

*Consumer Prod. Comm'n v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980)........................................................... 8

*Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. District v. U.S. Env't Prot. Agency*,
  169 F.3d 755 (D.C. Cir. 1999)................................................. 22

*Dohany v. Rogers*,
    281 U.S. 362 (1930) ............................................................................................... 10

*Duncan v. Walker*,
    533 U.S. 167 (2001) ...................................................................................... 8, 9, 10

*Fang ex rel. Yang v. Sec'y of Human & Health Servs.*,
    No. 10-33C, 2013 WL 4875120 (Fed. Cl. Aug. 22, 2013) ..................................... 35

*Fires v. Heber Springs Sch. Dist.*,
    565 F. App'x 573 (8th Cir. 2014) ........................................................................... 31

*Gregory v. United States*,
    110 Fed. Cl. 400 (2013) .......................................................................................... 39

*Haggart v. Woodley*,
    809 F.3d 1336 (Fed. Cir. 2016) .............................................................................. 10

*Hardy v. United States*,
    157 Fed. Cl. 464 (2021) .......................................................................................... 10

*Hash v. United States*,
    No. 1:99-cv-324-MHW, 2012 WL 1252624 (D. Idaho April 13, 2012) ................. 31

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ............................................ 2, 8, 18, 27, 28, 29, 31, 36, 39

*Hopi Tribe v. United States*,
    55 Fed. Cl. 81 (2002) .............................................................................................. 35

*Hubbert v. United States*,
    62 Fed. Cl. 73 (2004) .............................................................................................. 29

*Indep. Fed'n of Flight Attendants v. Zipes*,
    491 U.S. 754 (1989) ............................................................................................... 16

*Kirsch v. Fleet St. Ltd.*,
    148 F.3d 149 (2d Cir. 1998) ................................................................................... 33

*L.B. v. Kierst*,
    56 F.3d 849 (8th Cir. 1995) ................................................................................... 31

*Laborers' Int'l Union of N. Am. v. Brand Energy Servs.*, LLC,
    746 F. Supp. 2d 121 (D.D.C. 2010) ....................................................................... 33

*Lane v. Pena*,
    518 U.S. 187 (1996) ............................................................................................ 1, 11

*Larsen v. A.R. Res., Inc.*,
    453 F.Supp.3d 849 (E.D. Va. 2020) ....................................................................... 39

*Lawrence v. Sec'y of Human & Health Servs.*,
    No. 09-435V, 2013 WL 3146775 (Fed. Cl. May 28, 2013) ................................... 35

*Marre v. United States,*
38 F.3d 823, 828–29 (5th Cir. 1994). ................................................................. 15

*Missouri v. Jenkins,*
491 U.S. 274 (1989) .......................................................................................... 34

*Montanez v. Simon,*
755 F.3d 547 (7th Cir. 2014) ............................................................................. 32

*Moriarty v. Svec,*
233 F.3d 955 (7th Cir. 2000) ............................................................................. 40

*MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.,*
No. 95-CIV-9569 (RO), 2001 WL 674142 (S.D.N.Y. June 15, 2001).................... 39

*Oliveira v. United States,*
827 F.2d 735 (Fed. Cir. 1987) ........................................................................... 37

*Otay Mesa Property, L.P. v. United States,*
124 Fed. Cl. 141 (2015) ............................................................................... 28, 38

*Outdoor Systems, Inc. v. City of Mesa,*
997 F.2d 604 (9th Cir. 1993) ............................................................................. 30

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air,*
478 U.S. 546 (1986) ................................................................................ 1, 2, 18, 40

*Perdue v. Kenny,*
559 U.S. 542 ................................................................................................ 16, 18

*Preseault v. United States,*
52 Fed. Cl. 667 (2002) ............................................................................ 13, 14, 37

*R.C. Const. Co., Inc. v. United States,*
42 Fed. Cl. 57 (1998) ........................................................................................ 37

*Raney v. Federal Bureau of Prisons,*
222 F.3d 927 (Fed. Cir. 2000) ........................................................................... 13

*Saizan v. Delta Concrete Products Co., Inc.,*
448 F.3d 795 (5th Cir. 2006) ............................................................................. 40

*Santa Fe Nat. Tobacco Co, Inc., v. Spitzer,*
2002 WL 498631 (S.D.N.Y. March 29, 2002) ...................................................... 33

*Shelden v. United States,*
41 Fed. Cl. 347 (1998) .................................................................................. 13, 14

*Skillforce, Inc. v. Hafer,*
509 B.R. 523 (E.D. Va. 2014) ............................................................................ 16

*Smith v. Bd. of Commissioners of La. Stadium and Exposition Dist.,*
No. CV 17-7267, 2021 WL 6332245 (E.D. La. May 25, 2021)............................. 32

*Sta-Home Home Health Agency, Inc. v. Shalala,*
   34 F.3d 305 (5th Cir. 1994) ................................................................ 14, 15

*Steele v. Drummond,*
   275 U.S. 53 (1927) ...................................................................................... 20

*TRW Inc. v. Andrews,*
   534 U.S. 19 (2001) ........................................................................................ 9

*United States v. 122.00 Acres of Land,*
   856 F.2d 56 (8th Cir. 1988) ................................................. 11, 12, 15, 16, 20

*United States v. 4.18 Acres of Land,*
   542 F.2d 786 (9th Cir. 1976) ................................................................ 10, 11

*Whispell Foreign Cars, Inc. v. United States,*
   139 Fed. Cl. 386 (2018) ........................................................... 18, 27, 31

**Statutes**

11 U.S.C. § 362(k) ................................................................................ 16

26 U.S.C. § 7430(a) .............................................................................. 15

42 U.S.C. § 1395f(b)(1) ........................................................................ 14

42 U.S.C. § 1395x(v)(1)(A) ................................................................... 14

42 U.S.C. § 1988 ................................................................... 15, 16, 33

42 U.S.C. § 4654 ................................................................................ 11

42 U.S.C. § 4654(c) (2006) ........................................................... passim

**Rules**

F.R.E. 408(a) ........................................................................................ 8

F.R.E. 408(b) ........................................................................................ 8

RCFC 8 ................................................................................................ 28

RCFC 11(b)(3) ..................................................................................... 28

**Table of Exhibits**

| Exhibit | Description |
|---------|-------------|
| A | Retention Agreement |
| B | Declaration of Dr. Laura Malowane |
| C | United States' Objections to Plaintiffs' Fees |
| D | United States' Modified Hours Per Timekeeper |
| E | United States' Objections to Plaintiffs' Expenses |

## INTRODUCTION

This action is one of three nearly identical, rails-to-trails cases concerning a railroad line through rural Kansas and Nebraska.[1]  In this action, counsel obtained the smallest recovery—an average of $357 on average for each plaintiff.  In this action, counsel acknowledged that Plaintiffs' claims were not complex.  And in this action, counsel was based in a small town as a solo practitioner.  Yet, it is in this action that Plaintiffs demand the largest payment of costs and expenses – over $1 million – under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c) (2006) ("URA").  Counsel's demand to be paid over $1 million for obtaining such a small sum in a simple case shocks the conscience and should be rejected.

The URA is a waiver of sovereign immunity.  Congress enacted the URA to ensure that plaintiffs receive the full measure of just compensation for property taken by the United States.  However, under oft-repeated, black letter law, the URA's wavier of sovereign immunity must be "strictly construed . . . in favor of the sovereign."  *See Lane v. Pena*, 518 U.S. 187, 192 (1996).  Plaintiffs are thus entitled to payment in accordance with the URA's plain language; they are not entitled to more.  Fee-shifting statutes "were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986).

The language of the URA is both unique and unambiguous.  It is at bottom a reimbursement provision.  Specifically, it provides that each prevailing "plaintiff" is entitled to "reimbursement" of "costs, disbursements, and expenses" that the plaintiff "actually incurred" in

---

[1] The other cases are:  *Flying S. Land Co. v. United States*, No. 15-1253 L, and *Dawson v. United States*, No. 15-1268 L.

1

asserting its claim.  42 U.S.C. § 4654(c).  Attorney fees are no different than any other

reimbursable cost.  *Id*. (listing "attorney, appraisal, and engineering fees" as potentially

reimbursable costs).  In addition, only "reasonable" costs are recoverable.  *Id*.

Plaintiffs' motion cannot be squared with the URA's plain language and purpose.  Thus,

the appropriate attorney fee recovery for Plaintiffs here is nothing – this result accords with their

own retention agreements.  A sample agreement is attached as Exhibit A.  The United States

should not owe more to Plaintiffs' counsel than Plaintiffs themselves do.  However, even if the

lack of a fee owed by Plaintiffs were merely another factor to consider in evaluating the

reasonableness of claimed attorney fees, Plaintiffs' demand should be rejected.  The lodestar –

reasonable hours times reasonable rates – is generally considered a "useful starting point" in

evaluating the reasonableness of a request for attorney fees.  *See Hensley v. Eckerhart*, 461 U.S.

424, 433 (1983).  Here, Plaintiffs' lodestar calculation is deeply flawed.

First, and significantly, the rates Plaintiffs use for their lodestar calculations are excessive

and unsupported; they far exceed the rates clients actually pay for real estate litigation work in

Joplin, Missouri – the relevant practice area and market for this case.  Plaintiffs are not entitled

to rates for complex litigation, other legal specialties, or other geographical markets.  It is telling

that Plaintiffs offer nothing but self-serving declarations and references to cases involving other

practice areas.  In contrast, the United States proffers a detailed analysis of the St. Louis market –

the closest locale with significant data – by a well-respected economist that establishes market-

based rates for real estate litigation services.  *See* Declaration of Dr. Laura Malowane

("Malowane Decl."), attached as Exhibit B.  These market-based rates for real estate litigation

services should be considered an upper limit to the extent a lodestar calculation is relevant.

Second, the URA does not entitle counsel to "every hour counsel elects to spend without

regard to the import to or ultimate impact on the case."  *Arnold v. United States*, 2022 WL

14198936, at *16 (Oct. 24, 2022).  Plaintiffs seek payment for attorney time expended on client

solicitation and development, on unsuccessful claims, on duplicative, excessive, unnecessary,

and administrative work, and excessive fees on fees work.  Notably, Plaintiffs wrote off only

7.80 hours on this case of seven years.  Moreover, the sort of efficiencies one would expect from

experienced counsel are absent.  Plaintiffs seek, for instance, over 650 hours to prepare the

complaint – a standard document in rails-to-trails litigation that should require almost no

attorney time.[2]

Third, Plaintiffs simply disregard degree of success.  Not only did Plaintiffs obtain no

recovery for one-third of their claims, but the just compensation received by the prevailing

Plaintiffs totaled less than $5,000, before interest.  The excessive hours spent on this action thus

yielded little benefit.  Degree of success is a well-established basis for reducing a lodestar award.

Plaintiffs' failure to make any such adjustment has led to a disproportionate demand for

attorneys' fees that is more than 193 times Plaintiffs' cumulative recovery.  Absent extraordinary

circumstances, which Plaintiffs fail to provide in their motion, it is unreasonable to pay two

dollars – much less $193 dollars – to get one dollar in return.  A substantial downward

adjustment in the lodestar of no less than 75 percent is necessary to account for the *de minimis*

recovery of roughly $357 on average for each "successful" Plaintiff.

This Court should award each Plaintiff the total amount that Plaintiff actually owes to

current counsel under their respective retention agreements, which is zero.  That is the

reimbursement payable under the URA.  Assuming, arguendo, that the Court concludes there is

---

[2] The United States has prepared specific line-item objections to Plaintiffs' billing entries, which
are attached as Exhibit C, and described in detail below.  Exhibit D also shows the modified
hours and rates for each timekeeper based on the objections identified herein.  Similarly, the
expenses for which Plaintiffs seek reimbursement must be reasonable, so the United States has
also identified specific objections to those entries, which are attached as Exhibit E.

some basis to deviate from this amount, it should still reject Plaintiffs' demand for more than one

million dollars in fees and expenses and, instead, determine what constitutes a reasonable

reimbursement incorporating the reductions set forth by the United States below.

## FACTUAL AND PROCEDURAL BACKGROUND

This case should have been simple and straightforward.  It did not go to trial or require

any oral arguments.  Only one round of summary judgment briefing was needed to resolve

ownership issues.  Plaintiffs themselves describe the case as based on "settled legal authority"

under the Trails Act and "well settled principles of Kansas law."  ECF No. 208 ("Pls.' Mem.") at

6-7.  However, Plaintiffs refused to stay the case, pressing unsupported legal arguments for

"permanent" taking claims and state law abandonment, leading to years of unnecessary litigation.

This case can be organized into three general phases.  The first phase encompassed the

filing of the Complaint in October 2015 to the resolution of the title issues in July 2018.  On

April 10, 2018, the Court granted summary judgment on 17 of Plaintiffs' claims and denied

summary judgment for two claims.  ECF No. 85.  By July 6, 2018, the parties had resolved the

remaining title issues, which resulted in the dismissal of four claims.  ECF No. 86.  The second

phase ran from July 7, 2018, to December 17, 2020, when the parties reached a tentative

settlement agreement as to just compensation for the remaining 17 claims.  *See* ECF No. 141.

The final phase of the case was from December 3, 2020, to June 1, 2022, and it primarily

involved the attempt to resolve the reimbursement of attorneys' fees and expenses sought by

Plaintiffs.

### 1.    *NKCR and STB Proceedings*

This case stems from the actions of third parties.  The Nebraska, Kansas & Colorado

Railway, LLC ("NKCR") previously operated an interstate railroad line in Nebraska and Kansas,

and on June 12, 2015, NKCR filed a notice of exemption to begin the process for seeking

authorization to abandon rail service on 57.31 miles of rail lines located in three segments in

Harlan County, Nebraska, and Norton, Decatur, and Phillips Counties, Kansas.  ECF No. 59-2.

Before the railroad could consummate abandonment of the railroad, the Sunflower Rails-to-

Trails Conservancy ("Sunflower") filed a statement of willingness to assume financial

responsibility for the rail line on September 2, 2015, and a request for trail use over the rail line

on September 14, 2015, to which NKCR consented.  ECF Nos. 59-4, 59-5.  On October 22,

2015, the Surface Transportation Board ("STB") issued a NITU providing NKCR and Sunflower

a 180-day period to negotiate an agreement for interim trail use and rail banking.  ECF No. 59-5.

On March 29, 2016, Sunflower requested an extension of 180 days to October 16, 2016,

in order to continue good-faith negotiations for a trail agreement.  ECF No. 59-7.  NKCR did not

object to the extension, so the STB granted it on April 14, 2016.  ECF Nos. 59-8 and 59-9.  On

September 14, 2016, Sunflower requested a second extension of 180 days from the STB.  ECF

No. 59-10.  However, NKCR objected to the second extension.  ECF No. 59-11.  As a result, the

NITU expired without an additional extension on October 16, 2016. ECF No. 59-12.

The STB informed NKCR that it should file a notice of consummation of abandonment

by December 15, 2016, if NKCR chose to abandon the rail line.  *Id.* at 2.  After that, NKCR

requested multiple extensions to the deadline to consummate abandonment, until it finally chose

to do so on September 3, 2019.  ECF No. 77 at 5; ECF No. 109.

2.    *Case Proceedings*

Seventeen Plaintiffs filed this action on October 26, 2015, long before it was known how

the administrative process would conclude.  ECF No. 1.  On March 18, 2016, Plaintiffs filed

their first amended complaint, a 109-page document which added two new plaintiffs, resulting in

a total of 19 Plaintiffs and 27 claims.  ECF No. 15.  The parties then engaged in the "claims

book" review process, reviewing material provided by Plaintiffs to support their claims of

ownership of the railroad corridor and adjacent properties, and through that process, the parties resolved some issues.  ECF No. 30.

The Court ordered summary judgment briefing to address the remaining title issues.  ECF No. 27.  Instead, Plaintiffs moved for partial summary judgment as to liability on March 13, 2017.  ECF No. 33.  Pursuant to the schedule, the United States responded and cross-moved for summary judgment.  ECF No. 42.  The Court then denied Plaintiffs' motion as premature, directing Plaintiffs to revise their motion to solely address title issues, as previously ordered. ECF Nos. 45 and 46.  When the Court ordered Plaintiffs to explain the proper conveyances for two Plaintiffs to the railroad company, ECF No. 46, Plaintiffs voluntarily dismissed those claims. ECF Nos. 47, 48.

On July 27, 2017, Plaintiffs moved for partial summary judgment, addressing title issues for 18 Plaintiffs and 23 claims.  ECF No. 56.  The United States renewed its cross-motion.  ECF No. 59.  The Court granted summary judgment to 14 Plaintiffs on 17 claims and granted summary judgment to the United States on two claims.  ECF No. 77.  The Court denied both parties' motions as to four claims, which Plaintiffs later dismissed voluntarily.  *Id*.; *see* ECF No. 85.  Thus, by July 6, 2018, out of the initial 19 Plaintiffs and 27 claims, 5 Plaintiffs and 10 claims had been resolved in favor of the United States.

The case's focus then turned to determining liability where the NITU had expired, no trail-use agreement had been reached, and the railroad had not chosen to consummate abandonment of the rail corridor.  The United States suggested on multiple occasions that the case be stayed until the administrative abandonment process ended.  Plaintiffs objected and instead urged that any stay be tied to certification of the Court's summary judgment ruling for interlocutory appeal.  *See* ECF Nos. 95 and 99.  In a June 13, 2019 filing, Plaintiffs argued the case had "effectively entered an informal stay" since the previous year.  ECF No. 101 at 6.

Plaintiffs requested that the informal stay be continued to allow certain issues to be referred to the STB. *Id.* Ultimately, the Court declined to stay the case.

This action proceeded in parallel with two other cases, *Flying S. Land Co. v. United States*, No. 15-1253 L, and *Dawson v. United States*, No. 15-1268 L, which involved the same railroad corridor.[3] This led to inefficiencies. For instance, Plaintiffs' counsel recognized that "state law abandonment" was not an issue in this case in 2016 and in 2018. *See* ECF No. 26 at 7-8 and ECF No. 84 at 1-2. However, in July 2019, counsel changed position and joined counsel in *Flying S. Land* and *Dawson* in proposing summary judgment briefing on state law abandonment. ECF Nos. 105, 107. The United States objected to the necessity and appropriateness of the motions, ECF No. 105, which ultimately were fully briefed. *See* ECF Nos. 107, 108, 109.

In 2020, after the railroad had consummated abandonment and the Federal Circuit had issued its decision in *Caquelin v. United States*, the parties entered into settlement discussions. The Court stayed the case on September 21, 2020. ECF No. 136. The parties reached a settlement as to just compensation on December 17, 2020. ECF No. 141.

### 3.    *Plaintiffs' Fees Petition*

On October 11, 2022, Plaintiffs moved for an award of reasonable attorneys' fees and expenses pursuant to the URA.[4] ECF No. 207. In support of their motion, Plaintiffs filed a memorandum, ECF No. 208, and an appendix of exhibits, ECF No. 209. In these documents,

---

[3] The United States raised the issue of consolidating the cases in the interest of efficiency given the common issues they shared. Plaintiffs' counsel opposed consolidation, ECF No. 26, which the Court ordered almost three years later. ECF No. 110.

[4] The United States notes that, based upon Plaintiffs' documentation, this motion actually seems to seek $1,033,147.50 in fees and $9,254.17 in expenses. Plaintiffs include $70,860.00 for the "real estate title and abstracting services of Elite Consulting, Inc." as expenses, but these entries seem more appropriately assessed as fees for contract paralegal work.

Plaintiffs improperly included confidential settlement communications for the express purpose of identifying the United States' settlement positions. Federal Rule of Evidence 408 provides that evidence of settlement communications "is not admissible -- on behalf of any party – either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction . . . ." F.R.E. 408(a). While the rule provides some exceptions for when a court might admit this evidence, none of those apply here. *See* F.R.E. 408(b). In addition, the spirit of the communications was that they were confidential, as they were clearly marked. The Court should strike from the record the summaries of the settlement communications in Plaintiffs' motion and memorandum and strike Plaintiffs' Exhibit 4. *See* ECF No. 207 at 4, ECF No. 208 at 21-22, ECF No. 209-4.

## LEGAL BACKGROUND

I.    **The URA Limits the United States' Obligation to Reimburse Plaintiffs to the Costs and Expenses Plaintiffs Actually Incurred**

Congress' use of the phrase "actually incurred" in the URA limits, indeed caps, Plaintiffs' entitlement to fees and costs from the United States in this case. To begin, it is well established that, in the United States, each party generally bears its own attorneys' fees. *Bywaters v. United States*, 670 F.3d 1221, 1226 (Fed. Cir. 2012) (citing *Hensley*, 461 U.S. at 429) ("*Bywaters I*"). This is known as the American Rule. *Id.* But at times, Congress has provided for an exception to that rule and "allowed for recovery of attorneys' fees." *Id.* The URA is just such an exception, and it is the substantive basis for Plaintiffs' motion for attorneys' fees and costs here. To determine Plaintiffs' entitlement, the Court must look to that statute.

Interpreting and applying the URA starts with "the language of the statute." *See Duncan v. Walker*, 533 U.S. 167, 172 (2001); *see also Consumer Prod. Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("We begin with the familiar canon of statutory construction that the

starting point for interpreting a statute is the language of the statute itself.").  "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan*, 533 U.S. at 174).  Here, the relevant text of the URA provides:

> The court rendering a judgment for the plaintiff in a proceeding brought under section . . . 1491 of Title 28, awarding compensation for the taking of property by a Federal agency . . . shall determine and award or allow to such plaintiff, as a part of such judgment . . . such sum as will in the opinion of the court . . . reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, *actually incurred* because of such proceeding.

42 U.S.C. § 4654(c) (emphasis added).

To incur[5] means "[t]o suffer or bring on oneself (a liability or expense)."  *Incur*, Black's Law Dictionary (11th ed. 2019).  It can also mean "to become liable or subject to, or to bring down upon oneself." *Incur*, Merriam-Webster, https://www.merriam-webster.com/dictionary/incur (last visited Oct. 3, 2022).  The adverb "actually" can mean "in act or in fact" or "really." *Actually*, Merriam-Webster, https://www.merriam-webster.com/dictionary/actually (last visited Oct. 3, 2022).  It can also be defined "as an actual or existing fact." *Actually*, Dictionary.Com, https://www.dictionary.com/browse/actually (last visited Oct. 3, 2022).  Thus, when the URA speaks of "reimburs[ing] such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred," it is referring to those costs and expenses for which the plaintiff has really became liable. In other words, courts can only award those sums the plaintiff is in fact obligated to pay.

---

[5] Throughout their motion, Plaintiffs refer to records of services "actually and necessarily performed" to argue for lodestar reimbursement. *See* Pls.' Mem. at 2, 20, 36. But, the phrase "actually and necessarily performed" does not appear in the URA and is not relevant to this Court's consideration of whether Plaintiffs actually incurred attorneys' fees and expenses.

The verb the URA uses reinforces this interpretation.  It instructs courts to award sums that "will . . . *reimburse* such plaintiff." 42 U.S.C. § 4654(c) (emphasis added). "Reimburse" means "to pay back to someone" or to "repay."  *Reimburse*, Merriam-Webster, https://www. merriam-webster.com/dictionary/reimburse (last accessed Oct. 7, 2022).  It can also mean "to make restoration or payment of an equivalent to."  *Id.*  Reimbursement is thus premised upon a preexisting debt—you can only reimburse someone for something they already owe or have paid. You cannot reimburse someone for something they do not owe and have never paid.

The purpose of the URA also reinforces this plain meaning.  The URA provision at issue here "was expressly enacted with the primary purpose of rendering property owners whole."  *See Haggart v. Woodley*, 809 F.3d 1336, 1359 (Fed. Cir. 2016).  By placing the expenses of an inverse condemnation plaintiff on the shoulders of the government, the URA "allows landowners to retain the full compensation of the value of their property."  *Id.* at 1357.  And if a landowner is compensated for what he or she is really obligated to pay his or her counsel, then that landowner is made whole and receives full compensation for the value of their property; any further payment is a windfall that benefits only an attorney.

This plain meaning—that under the URA, a plaintiff is entitled only to those fees and costs he or she is actually liable to pay—is further supported by the fact that the URA is a waiver of sovereign immunity.  *Hardy v. United States*, 157 Fed. Cl. 464, 470 (2021) ("The URA waives federal sovereign immunity with respect to litigation expenses in takings cases.").  The reimbursement of attorneys' fees and expenses is not part of the Fifth Amendment's just compensation requirement; successful inverse condemnation plaintiffs are only entitled to attorneys' fees and expenses because Congress exercised its discretion in enacting the URA.  *Cf. Dohany v. Rogers*, 281 U.S. 362, 368 (1930) ("Attorneys' fees and expenses are not embraced within just compensation for land taken by eminent domain."); *see also United States v. 4.18*

*Acres of Land,* 542 F.2d 786, 788 (9th Cir. 1976) (per curiam).  And because the URA is a

waiver of sovereign immunity, courts must strictly construe it in favor of the United States.

*Lane*, 518 U.S. at 192 ("[A] waiver of the Government's sovereign immunity will be strictly

construed, in terms of its scope, in favor of the sovereign.").  Given this and the above

discussion, the URA can only be read to allow reimbursement of those costs a prevailing plaintiff

has an actual obligation to pay to his or her counsel.  It cannot be read to require payment by the

United States of amounts a plaintiff is under no duty to pay his attorney.  Doing so would

conflict with the plain meaning of the text, render the phrase "actually incurred" superfluous, and

fail to be a strict construction in favor of the United States.  It would be improper.[6]

Courts have recognized this limitation on URA reimbursement.  In *United States v.

122.00 Acres of Land, More or Less, Located in Koochiching County, Minnesota*, the United

States filed a condemnation action in district court.  856 F.2d 56, 57 (8th Cir. 1988).  The

landowner retained an attorney, with whom he executed a contingency fee agreement.  *Id.*  The

agreement provided that if the landowner did not recover, the landowner would not owe anything

to his attorney.  *Id.*  After trial, the jury returned a verdict on just compensation, but the United

States chose to abandon the condemnation and moved to dismiss the case.  *Id.*  The landowner

then moved for, among other things, an award of attorneys' fees and expenses.  *Id.* at 57–58.

The district court dismissed the case but ultimately awarded attorneys' fees pursuant to the URA.

*See id.* at 58.

On appeal, the Eighth Circuit stated that the landowner was only "entitled to any

reasonable attorney's fees which were *actually incurred* by him."  *Id.*  Thus, to determine

---

[6] The Ninth Circuit has described the URA's legislative history as "support[ing] a narrow
reading of the statute."  *4.18 Acres of Land*, 542 F.2d at 788.  In particular, it cited the "report of
the Public Works Committee of the House of Representatives" as "mak[ing] it clear that section
304 [i.e., 42 U.S.C. § 4654] is not to be construed broadly."  *Id.*

whether the United States was liable for attorneys' fees, the court stated that it "must determine whether [the landowner] has any legal obligation to pay his attorney . . . either by operation of the fee arrangement between them or otherwise." *Id.* It concluded he did not—the contingency agreement premised payment on the landowner's recovery of payment from the government for his land. *Id.* Because the landowner did not receive any payment from the government for his land, the landowner did not owe his attorney anything. *Id.* And because the landowner did not actually incur any obligation to his attorney, the United States owed the landowner no attorneys' fees under the URA, regardless of the fact that the URA explicitly authorizes attorneys' fees for landowners in abandoned condemnation proceedings. *See id.* The court did not fashion an alternative lodestar payment to the landowner's attorney for his time spent on the case; it denied recovery of attorneys' fees because the landowner did not actually incur any. *See id.*

A judge of this Court has similarly applied the language of the URA. In *Washington Metropolitan Area Transit Authority v. United States* ("*WMATA*"), the Court faced the question of how to award URA fees where the plaintiff was represented by a salaried, in-house counsel paid below market rates for the services that counsel provided in the litigation. *See* 57 Fed. Cl. 148, 149 (2003). Despite this fact, the plaintiff had sought fees at market rates. *Id.*; *see also id.* at 151 (plaintiff "claiming . . . it is entitled to a 'reasonable' attorney's fee under the URA, whether or not it paid its in-house counsel less"). The court rejected the plaintiff's efforts. Beginning with the text of the URA, the court looked to dictionary definitions for "reimburse" and "actually incurred." *Id.* at 150. It then concluded that:

> As a matter of abstract linguistics, combining these terms leaves little doubt that Congress intended plaintiffs to recover under the URA only attorney costs (as well as appraisal and engineering expenses) they were actually obliged to pay. Nothing in the statute's limited legislative history suggests otherwise. As such, costs, including attorney's fees, are recoverable under section 4654(c) not because they are abstractly "reasonable," nor, relatedly, because they might somehow be "deemed" or "constructively" incurred; nor even because they represent an amount

12

appropriate as punishment for, or deterrence against, some conduct. Rather, such costs, to be eligible for reimbursement, must be "actually" incurred because of the litigation. Short of awkwardly stacking adverbs (e.g., "*really*, actually incurred"), this court can scarcely imagine how Congress could have made its intent in this regard any more plain.

*Id.* (footnote omitted).

The court also looked to *Raney v. Federal Bureau of Prisons*, 222 F.3d 927 (Fed. Cir. 2000). *Id.* at 151–52. There, in the context of the Back Pay Act, the Federal Circuit had pointed out that limiting the fee award to the cost of providing the legal services would add a requirement "that the fees be 'actually' incurred." *See id.* (citing *Raney*, 222 F.3d at 932–34). In contrast to the Back Pay Act, the URA includes precisely that phrase. *Id.* at 152. The court in *WMATA* thus concluded that Congress's addition of the phrase "actually" was "an express limitation that Congress plainly intended." *Id.* It stated that:

> [B]y expressly tying the words "reasonable attorney fees" to the qualifying phrase "actually incurred," the URA envisions a fee-shifting mechanism different from those analyzed in *Raney* and the Supreme Court cases upon which the Federal Circuit relied. As such, under the standards of section 4654(c), which controls this case, plaintiff cannot receive an award based on market rates, but instead is restricted to a reimbursement of the costs "actually incurred" as the result of the service of its in-house counsel.

*Id.* The court then proceeded to calculate the plaintiff's "actually incurred" costs for its in-house counsel by looking to the counsel's salary, benefits, and overhead, and rendered an award accordingly. *Id.* at 153–54.

To be sure, some Court of Federal Claims decisions have found otherwise.[7] *See Preseault v. United States*, 52 Fed. Cl. 667, 674–75 (2002); *see also Arnold*, 2022 WL

---

[7] The Court in *WMATA* acknowledged that other decisions from the Court of Federal Claims reached contrary conclusions. 57 Fed. Cl. at 153. It described as "[p]rominent among these" *Shelden v. United States*, 41 Fed. Cl. 347 (1998), *appeal dismissed*, 194 F.3d 1330 (Table) (Fed. Cir. 1999). *Id.* In *Shelden*, the court had held the URA "did not limit an attorney's fee award to a contingency fee percentage." *Id.* (citing *Shelden*, 41 Fed. Cl. 347). Rather, the court awarded a fee based on market rates by pointing to *Blanchard v. Bergeron*, 489 U.S. 87 (1989) and *Bess v.*

14198936, at *7.  However, the discussion of "actually incurred" in *Preseault v. United States*, 52 Fed. Cl. 667, 674–75 (2002), does not fit with *Raney* or the URA's plain language.  In particular, the court's conclusion in *Preseault* rendered "actually" superfluous, contrary to the requirements of statutory construction.  *WMATA,* 57 Fed. Cl. at 153.

Courts interpreting the phrase "actually incurred" in other statutes provide further support for United States' position.  For instance, in *Sta-Home Home Health Agency, Inc. v. Shalala*, 34 F.3d 305 (5th Cir. 1994), the Fifth Circuit addressed an issue of Medicare reimbursement.  *Id.* at 307.  The appellant was a medical services provider under the Medicare program, which reimburses providers for the reasonable cost of providing services to eligible beneficiaries.  *Id.* (citing 42 U.S.C. § 1395f(b)(1)).  The Medicare statute requires that for a cost to be reasonable, it must, among other things, be "actually incurred."  *Id.* (citing 42 U.S.C. § 1395x(v)(1)(A)).

The appellant, a non-profit, began a program whereby it asked its employees to contribute a portion of their paychecks to it, in order to shore up its finances.  *Id.*  For those employees who signed up, the appellant simply reduced their paychecks: "the contributed amount never left Sta-Home's account . . . it was never paid to the employee."  *Id.*  But the appellant nevertheless sought reimbursement from Medicare for the gross amount of its employees' salaries, including those portions never paid to the contributing employees.  *Id.* at

---

*Bess*, 929 F.2d 1332 (8th Cir. 1991). *Id.* (citing *Shelden*, 41 Fed. Cl. at 350).  But as the court in *WMATA* pointed out, the court in *Shelden* "failed to account adequately for the fact that neither the statute analyzed in *Blanchard*, nor that considered in . . . *Bess v. Bess* . . . required that recoverable fees be 'actually incurred.' Instead, those statutes provided, respectively, only that the fees be 'reasonable,' or 'reasonably incurred' and did not refer, as here, to an award as being a reimbursement."  *Id.*  The court in *WMATA* thus stated that it was "convinced that the construction of the URA evidenced in *Shelden* is irreconcilable with the limiting language of the statute, particularly as compared to other statutes lacking the 'actually incurred' requirement, and especially in light of *Raney* and other persuasive authorities."  *Id.*

308.  The Health Care Financing Administration ultimately rejected reimbursement of the full amount of the contributing employees' salaries, and the district court upheld that decision.  *Id.*

On appeal, the Fifth Circuit affirmed.  It observed that the donated portions of the contributing employees' salaries never left the appellant's account and were never paid. *Id.* at 309.  As a result, it concluded that "[b]ecause Sta-Home was never required to pay this portion of the salaries, it was most reasonable for the Secretary to conclude that that cost was not 'actually incurred.'"  *Id.*  In other words, because it never actually paid the funds, it never actually incurred those costs.  *See id.* at 310.

Courts have reached the same conclusion when construing language similar to that of the URA.  Construing 26 U.S.C. § 7430(a), the Fifth Circuit reduced an attorneys' fee award that was above the amount the plaintiff owed under a contingency fee agreement.[8]  *Marre v. United States*, 38 F.3d 823, 828–29 (5th Cir. 1994).  The government had argued that the plaintiff only incurred attorneys' fees equal to the amount he owed under his contingency fee agreement.  *Id.* at 828.  In deciding the appeal, the Fifth Circuit looked to *122 Acres of Land*, 856 F.2d at 58 (8th Cir. 1988), and concluded that the Eighth Circuit's interpretation of "actually incurs" to mean "only the amount owed under a contingency fee agreement" was consistent with other decisions under Section 7430 and the Equal Access to Justice Act. *Id.* at 828–29.  The court also contrasted Section 7430 with 42 U.S.C. § 1988, often the focus of the Supreme Court's attorney fee jurisprudence, by pointing out that the civil rights statute "allows the courts to award prevailing parties 'reasonable attorney's fee[s] as part of the costs,' without any requirement that those fees be incurred."  *See id.* at 829 (quoting 42 U.S.C. § 1988).  It then held that "[b]ecause § 7430 limits attorney's fees to those actually incurred, [the plaintiff] is entitled only to the

---

[8] "Section 7430(a) provides that 'the prevailing party may be awarded a judgment ... for reasonable litigation costs incurred' in a tax case." *Marre*, 38 F.3d at 828.

amount owed under the contingency fee agreement plus costs, to the extent reasonable." *Id.*; *see also Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 549, 551 (7th Cir. 2012) (upholding HHS's Secretary's "net cost approach" to implementing Medicare's "actually incurred" requirement for health care providers); *Skillforce, Inc. v. Hafer*, 509 B.R. 523, 533–34 (E.D. Va. 2014) (interpreting bankruptcy stay statute's provision for "*actual* damages, including costs and attorneys' fees" to mean attorneys' fees actually incurred—that the movant was "*actually* liable for the claimed fees" (first quoting 11 U.S.C. § 362(k)) (emphases in original)).

The Supreme Court has characterized the lodestar as the "guiding light" of its attorneys' fees case law. *See Bywaters I*, 670 F.3d at 1228–29 (citing *Perdue*, 559 U.S. 542). And it has also "stated . . . that fee-shifting statutes' similar language is 'a strong indication' that they are to be interpreted alike." *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 758 n.2 (1989). But the key phrase is "similar language." None of the cases in which the Court has addressed a lodestar calculation involved statutes that include the phrase "actually incurred," as does the URA. The URA differs from, for instance, the civil rights attorneys' fee statute, 42 U.S.C. § 1988, underlying much of the Court's jurisprudence, and other similar statutes. As the Fifth Circuit noted in *Marre*, Section 1988 states that "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee"; the URA, on the other hand, provides for the *reimbursement* of fees "actually incurred." *Compare* 42 U.S.C. § 1988 *with* 42 U.S.C. § 4654(c); *see also Perdue*, 559 U.S. at 550 n.3 (noting that "virtually identical" language to § 1988's "reasonable attorney's fee" language "appears in many of the federal fee-shifting statutes"); *see also City of Burlington v. Dague*, 505 U.S. 557, 561–62 (1992) (noting that "reasonable attorney . . . fees" language "is similar to that of many other federal fee-shifting statutes" and Court's "case law construing what is a 'reasonable' fee applies uniformly to all of them").

16

Thus, the Supreme Court's lodestar precedent addresses how to calculate "a reasonable attorney's fee" when fee-shifting statutes provide for the award of a reasonable attorneys' fee. It does not address a statute with different language that requires a different approach. The URA is uniquely tied to the Fifth Amendment and is designed to ensure the property owner receives full just compensation. It looks to what that property owner must pay as "attorney, appraisal, and engineering fees." The statute does not call for payment of a reasonable attorneys' fee; it calls for the reimbursement of actually incurred attorneys' fees to the extent they are reasonable.[9]

This does not mean the lodestar is irrelevant. The lodestar remains a guidepost by which to assess reasonableness – an element of reimbursement under the URA. And in certain factual circumstances it may be that the lodestar calculation represents costs actually incurred. But where the costs actually incurred by a prevailing party under a Tucker Act takings suit are less than a lodestar calculation, the URA does not permit a court to award the lodestar calculation as reimbursement under the URA. Such an award would not reimburse a plaintiff's actually-incurred costs and would therefore be without basis in law. The URA only waives sovereign immunity to allow for the reimbursement of those costs a landowner actually owes because of the takings litigation.

## II.    The Lodestar Serves As A "Useful Starting Point" For Evaluating The Reasonableness of Claimed Attorney Fees under the URA

The URA authorizes reimbursement of costs and expenses, including attorney fees, only to the extent they are reasonable. *See* 42 U.S.C. 4654(c). Determining the reasonableness of an

---

[9] Thus, while in *Bywaters* the Federal Circuit stated that "the Supreme Court has advised that all federal fee-shifting statutes calling for an award of 'reasonable' attorneys' fee should be construed 'uniformly,'" its claim that '[n]othing in the language or legislative history of the URA suggests that it should receive a different construction than other fee-shifting statutes" is incorrect because it ignores the language of the URA. *See Bywaters*, 670 F.3d at 1228. The language in the URA is different from other fee-shifting statutes.

17

attorney fee award "is a matter that is committed to the sound discretion of a trial judge." *Perdue*, 559 U.S. at 558. In the context of other fee-shifting statutes, the Supreme Court has stated that "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433. This is commonly referred to as the lodestar. *See id.*

The lodestar is not "intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client," but "to enable private parties to obtain legal help in seeking redress for injuries." *Del. Valley*, 478 U.S. at 565. Even so, a cardinal rule governing attorneys' fees under fee-shifting statutes is that hours "not properly billed to one's client are also not properly billed to one's adversary pursuant to statutory authority." *Whispell Foreign Cars, Inc. v. United States*, 139 Fed. Cl. 386, 395 (2018) (citing *Hensley*, 461 U.S. at 434). In addition, the Supreme Court has cautioned that "[t]he product of reasonable hours times a reasonable rate does not end the inquiry" because there are "other considerations" that may lead the court to adjust the fee based on the particular circumstances of the case. *Hensley*, 461 U.S. at 434. A court may consider various factors in making its fee determination when using a lodestar approach, including the novelty of the questions and the results obtained, so long as those factors are not otherwise "subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Id.* at 434 n.9. And, the Supreme Court has instructed that the "most critical factor" when assessing a reasonable fee award is the "degree of success obtained." *Id.* at 436.

## ARGUMENT

The average plaintiff in this action received $357 as just compensation. Plaintiffs' counsel now requests reimbursement of $1,041,411.67 in costs and expenses – an amount 194 times the stipulated judgment for just compensation plus interest – in this unremarkable Trails

Act case.  Plaintiffs have "actually incurred" no liability to their attorney under their respective retention agreements.  This should end the inquiry under the URA.  Moreover, it is likely the reason for the absence of billing judgment that has led to the excessive demand pending before the Court.  No paying client in Joplin, Missouri, would be presented with a bill so laden with excessive time, above-market rates, and wasted effort.  If any URA reimbursement is awarded by the Court in this routine Trails Act case, it should be a mere fraction of the amount demanded.

I.    **Because Plaintiffs Have Not Actually Incurred Any Attorneys' Fees Under Their Attorney Representation Agreement, They Are Not Entitled to Reimbursement Under The URA**

Under the terms of the respective attorney representation agreements between Mr. Edwards and Plaintiffs, a sample of which is attached as Exhibit A, each Plaintiff actually incurs neither attorneys' fees, expenses, or costs, nor any other legal obligation to Mr. Edwards, in exchange for his representation.  And as explained above, the URA only provides for reimbursement of costs that Plaintiffs are legally responsible to pay.  Consequently, Plaintiffs are not entitled to any reimbursement under the URA, let alone the $1,041,411.67 in fees and expenses they currently seek.

Indeed, the agreement makes a point to unambiguously establish that Plaintiffs will *not* be liable to their attorneys for any fees or costs associated with representation.  The document recites putative rates the attorneys and his staff will "charge," but then states that "CLIENT(S) will not be liable for any case fees, expenses or costs to the extent permitted by law or rule, but rather shall be solely submitted to the U.S. Government for payment under applicable law."  Ex. A ¶ 3.  Accordingly, the attorneys are not "charging" their client; they are attempting to charge the United States directly.[10]  By expressly releasing the Plaintiffs from any costs or liability to

---

[10] The document also states that the "ATTORNEY . . . will seek reimbursement of all reasonable costs, expenses, attorneys fees, etc. . . . from the U.S. Government at the conclusion of the case,

19

their counsel for legal work performed on this case, Plaintiffs have incurred no liability, and there is nothing for the United States to reimburse under the URA. *See 122.00 Acres of Land*, 856 F.3d at 58; *cf. Arnold*, 2022 WL 14198936, at *7 (finding that the "express terms" and "plain language" of plaintiffs' retention agreement did not limit attorney's fees to a percentage of recovery because the agreement entitled counsel to the greater of one-third of the total damages award or the statutory attorney fee).

Such a result is both fair and consonant with this Court's jurisprudence. First, it is a long-held principle of contract interpretation that parties are free to agree to the terms of a contract. *See Steele v. Drummond*, 275 U.S. 53, 54 (1927) (". . . it is a matter of great public concern that freedom of contract be not lightly interfered with.") (internal citations omitted); *see also Bowers v. Baystate Technologies, Inc.*, 320 F.3d 1317, 1323 (Fed. Cir. 2003) ("Courts respect freedom of contract and do not lightly set aside freely-entered agreements.") (internal citations omitted). Plaintiffs' counsel should not be heard to complain about the terms of an agreement he signed and presumably drafted. *See, e.g.*, *122.00 Acres of Land*, 856 F.2d at 59 (noting that counsel "bargained away" his right to compensation based on *quantum meruit* where the express terms of the retention agreement stated "[i]f there is no recovery, the undersigned will bear no expense for attorney's fees").

Second, it is a bedrock legal principle that waivers of sovereign immunity are strictly construed. The URA provides limited rights to successful taking "plaintiffs" – not to their counsel – and it is plaintiffs who are to be made whole. There can be no claim that that has not occurred here. Plaintiffs suggest that denying their fee request, in part or in full, would violate

---

and not from the CLIENT(S)." Ex. A ¶ 4. That approach is unauthorized under the URA, which is a limited waiver of sovereign immunity vis-a-vis each plaintiff—not their attorney—for reasonable fees and costs for which the plaintiff is liable.

the URA's purpose of "allow[ing] for recovery of attorneys' fees adequate to permit people with small takings claims to vindicate their rights with the assistance of competent counsel." *Bywaters v. United States*, 684 F.3d 1295 (Fed. Cir. 2012) ("*Bywaters II*").  But the United States is not arguing that attorneys' fees are "not available because of the small amount of the claim." *Id.*  The denial of reimbursement results solely from the unconventional retention agreement between counsel and client, and the limited scope of the Congressional waiver of sovereign immunity in the URA.

## II.    The Amount Plaintiffs Seek as Reimbursement is Unreasonable

The total fees that Plaintiffs seek are based on a putative lodestar calculation.  However, for a host of reasons, Plaintiffs' calculation is unsound.  Because the amount Plaintiffs demand is not *reasonable*, it is not payable under the URA irrespective of whether the attorney fees were "incurred."

### A.    Plaintiffs calculate the lodestar using excessive rates.

The rates used by Plaintiffs in their lodestar calculation are excessive.  Hourly rates should be based on practice area (real estate litigation), complexity of the work (routine), and the market where work is performed (Joplin, Missouri).  Relying on their own attorneys' self-serving declarations, Plaintiffs proffer rates substantially higher than those for routine real estate work in the Joplin market.  Plaintiffs' anecdotal evidence is unsound and should be disregarded.

The purpose of the URA is not to provide a windfall to attorneys, but rather to ensure that successful plaintiffs are fully reimbursed.  *See* 42 U.S.C. § 4654(c) (directing courts to "reimburse" litigation expenses that plaintiffs have "actually incurred").  But reimbursement is available only for *reasonable* fees and costs.  In assessing reasonableness, the Supreme Court has explained that a reasonable hourly rate is "the prevailing market rate," defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill,

experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984). Dr. Laura

Malowane, an experienced economist who analyzed the specific practice area in this action – real

estate litigation – derived such rates from market data. To the extent rates are necessary to the

Court's analysis, it should use Dr. Malowane's.

> 1.    There is no dispute that any lodestar calculation should be based on local
>        rates.

The relevant community of litigators for the purposes of determining a reasonable hourly

rate frequently is based on "forum rule" under which the community is the forum where the trial

court sits. *See Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1348 (Fed. Cir. 2008)

(listing cases). That rule makes good sense in district courts where the geographical scope of the

court's jurisdiction is limited. Even in district court litigation, however, the D.C. Circuit

recognized an exception to the forum rule out of concern that out-of-forum attorneys whose work

is done primarily outside of the forum would receive a windfall if the court strictly applied the

forum rule in all instances. *Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv.*

*District v. U.S. Env't Prot. Agency*, 169 F.3d 755, 758 (D.C. Cir. 1999).

As this Court recently explained in a sister case: "An exception to the forum court

prevailing market rate lies where, as here, 'the bulk of the work is done outside of the District of

Columbia in a legal market where the prevailing attorneys' rates are substantially lower.'"

*Arnold,* 2022 WL 14198936, at *8 (quoting *Avera*, 515 F.3d at 1349 (adopting *Davis County*

exception in Vaccine Act case litigated in the Court of Federal Claims where legal services were

performed entirely in Cheyenne, Wyoming, and the prevailing market rates in Cheyenne were

significantly lower than the requested Washington, DC rates)). Here, the so-called *Davis County*

exception applies because: (1) Plaintiffs' counsel was based in Joplin for the entirety of this

case; (2) the bulk of the work was performed in Joplin; and (3) the attorney rates in the Joplin

market are significantly lower than the forum rates.  Plaintiffs do not dispute that the *Davis County* exception applies in this action.  *See* Pls.' Mem. at 5-6.

### 2. Plaintiffs proffer hourly rates in excess of the Joplin market.

Plaintiffs use above market rates in their lodestar calculation.  Specifically, Plaintiffs claim $450 per hour for their counsel of record, $425 per hour for a consulting contract attorney (Mr. Daniels), and $150 per hour for contracted services for Elite Consulting, Inc.  As this Court found in *Dawson*, this was a straightforward action that required little more than title examination work, routine summary judgment briefing, and the retention of an expert appraiser.  *See* 2022 WL 14198936, at *35 ("the case was not complex, discovery was minimal, there was no trial, and title, liability, and damages issues were amicably resolved through negotiations").  Plaintiffs offer nothing but anecdotes to support their claimed rates; they present no data showing that lawyers in the Joplin market are paid over $400 per hour for the kind of routine work this action entailed.  In contrast, Dr. Malowane, an economist with more than 25 years of experience in litigation consulting, *see* Ex. B, Malowane Decl. ¶ 1, examined Plaintiffs' requested rates, determined that they are unsupported by Plaintiffs' motion and market data, and concluded as a matter of economics that they exceed what attorneys actually receive from their clients in the Joplin market for real estate litigation.

Plaintiffs assert that their rates should be considered presumptively reasonable because they are similar to rates they or similarly-located attorneys charged, often while performing different services.  Pls.' Mem. at 12-13.  Plaintiffs "evidence" is little more than *ipse dixit*.  Plaintiffs cite no studies, data, or surveys to support their rates and rely, instead, on their alleged knowledge of the market.  Ex. B, Malowane Decl. ¶ 5.  "Relevant and reliable market rate information requires a proper delineation of the correct geographic and product (or service)

market and a statistically unbiased collection of a significant number of actual transaction data within these markets."  *Id*. ¶ 8.

Plaintiffs' counsel also contends that he settled three cases in which he had demanded $425 per hour.  ECF No. 209-2 at 10-11, Edwards Decl. ¶ 29.  However, the fact that cases settled is not an indication of the reasonableness of the rate demanded or even that the parties agreed on an hourly rate.  Nor does an agreement to settle one case prevent the United States from providing evidence of a reasonable rate in another case using data from the relevant market and practice area.

Finally, Plaintiffs' counsel identified six cases, including this case, in which he received written fee agreements from clients that contain an hourly rate of $450.  *Id*. ¶¶ 30-31.  However, as discussed above, Plaintiffs are not required to pay any fees under the fee agreements that they executed with Mr. Edwards.  *See supra* Sec. I.  As far as Plaintiffs are concerned, the agreements could have identified any amount as a "reasonable" hourly rate because they have no liability for any fees.  For the same reasons, the declaration of Plaintiff Hillebrand, attached as Exhibit 5 to Plaintiffs' motion, fails to support counsel's rates.

> 3.     *The rates paid to St. Louis practitioners engaged in real estate litigation should constitute a ceiling on the rates for routine real estate litigation in the Joplin market.*

Dr. Malowane provides a reasonable and supported basis for an upper limit on the hourly rate for Plaintiffs' counsel.  In this action, Plaintiffs' retained counsel who is based and conducted his work in Joplin, Missouri.  The United States procured a well-respected economist, Dr. Laura Malowane, to ascertain the amounts actually paid to Joplin practitioners in cases, like this one, that involve real estate litigation.  *See* Ex. B, Malowane Decl. ¶¶ 1-3.  Ultimately, Dr. Malowane determined that there was limited data available due to the small legal market in Joplin and that statistically reliable rates for St. Louis should serve as the upper bound for fees in

Joplin.  *Id.* ¶¶ 38, 40.  She also ascertained that the Bureau of Labor Statistics found Joplin attorney salaries approximately 5.92 percent less than those in St. Louis.  *Id.* ¶ 40 n.34.

Dr. Malowane describes the data she used and provides a detailed explanation of her methodology and conclusions in her declaration.  Dr. Malowane obtained statistically sound data on actual collected rates in real estate litigation and used that data to determine the market rate for such services in St. Louis from 2015 to 2022.  *Id.* ¶¶ 19-40.  Additionally, to help verify her results and provide a broader perspective, Dr. Malowane analyzed actual collected rates for Real Estate Title Litigation, Real Estate Easement and Right-of-Way Non-Litigation, and Complex Federal Litigation.  *Id.*  Using these various sources, Dr. Malowane determined that the rate sought for counsel *in Joplin* exceeds the market rate *(i.e.*, the amount actually paid by clients) for real estate litigation work *by St. Louis attorneys*.  *See id.* ¶¶ 38-40.  Significantly, Dr. Malowane also found that Plaintiffs' "requested rates are not based on reliable data or consistent methodologies."  *Id.* ¶ 6; *see also* ¶¶ 7-12.

To evaluate the relevant market rate, Dr. Malowane looked at multiple sources.  She first uses the Real Rate Report.  *Id.* ¶ 14.  "The Real Rate Report is an annual publication that provides attorney rates derived from actual fees charged by law firm professionals as recorded on invoices submitted and approved for payment."  *Id.* ¶ 17.  In other words, this report shows actual rates, not published or rack rates, of practicing attorneys in various practice areas.  *Id.*  The Real Rate Report provided various data sources, including St. Louis real estate attorney rates by job title and St. Louis rates for all legal areas by years of experience.  *Id.* ¶¶ 19, 27.  After reviewing the national rates in the Real Rate Report, Dr. Malowane then adjusted those rates to the relevant legal specialties.  *Id.*  To determine the final rates for real estate litigation in St. Louis, Dr. Malowane averaged these two adjusted rates.  *Id.* ¶ 31.

Additionally, Dr. Malowane looked to the Missouri Lawyers Media, which regularly publishes billing reports from fee applications filed with various Missouri courts, to see if the Real Rate Report data was consistent with other sources. *Id*. ¶¶ 33-34.  Given that the partner rates in the Real Rate Report ranged from $409-465 for all legal areas in St. Louis and the partner rates in Missouri Lawyers Media were $450, she found this source to provide additional confidence that the derived rates were reasonable. *Id*. ¶ 34.  Dr. Malowane also reviewed the Survey of Law Firm Economics, an annual survey of law firms last conducted in 2014, but after adjusting the rates to recent years, she found those rates to be lower than those derived from the Real Rate Report. *Id*. ¶¶ 35-37.

The specific market rates for real estate litigation work by St. Louis practitioners at various experience levels– the best available match for the work performed by Plaintiffs' counsel in this action – are:

| Years of Experience | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| 21+ | $273 | $271 | $280 | $285 | $309 | $323 | $317 | $338 |
| 9 to 20 | $254 | $252 | $260 | $264 | $292 | $306 | $304 | $324 |
| 7 to 8 | $197 | $198 | $203 | $213 | $220 | $229 | $225 | $240 |
| 3 to 6 | $165 | $170 | $172 | $188 | $188 | $195 | $192 | $204 |
| Less than 3 | $160 | $164 | $166 | $183 | $182 | $189 | $186 | $198 |
| Paralegal | $60 | $56 | $74 | $84 | $92 | $90 | $103 | $109 |

*Id*. ¶ 32.  These market-based rates should be the *maximum* rates used in any lodestar calculation assessing reasonableness.[11]  Due to the smaller market in Joplin, Missouri, where Plaintiffs' counsel practices, this Court should further reduce these rates by ten percent.

---

[11] Plaintiffs identify Elite Consulting, Inc. as performing "real estate title and abstracting services," Pls.' Mem. at 43, but Plaintiffs' counsel utilized them as a contract paralegal service, including communicating with Mr. Edwards, conducting assigned research, and locating documents in public records.  *See* ECF 209-1 at 76-94.  Therefore, their rates should be limited to those of a paralegal using the rates identified for St. Louis as a ceiling, not $150 per hour.  Further, Plaintiffs' counsel identifies that he has employed Elite Consulting, Inc. since 2002, but

**B.      Plaintiffs are only entitled to reimbursement for time reasonably expended on successful claims.**

At the parties' June 14, 2022 status conference, this Court specifically instructed Plaintiffs to identify work reasonably related to the successful prosecution of the *Arnold* claims, excluding motions for extensions of time, time spent recruiting clients, and unnecessary filings. Further, the Court ordered Plaintiffs to cite the relevant ECF numbers for claimed attorneys' fees and expenses.  ECF No. 183.  Plaintiffs' request is not limited to work "reasonably related" to successful claims.  Therefore, to the extent the Court engages in a lodestar analysis, it should reduce the claimed hours.

### 1.      *Plaintiffs grossly overbill for pre-complaint work.*

Plaintiffs' demand for nearly 700 hours of pre-complaint attorney time exemplifies the overbilling prevalent throughout this action.  The complaint in this Trails Act action is a standard form.  It can be completed by clerical staff (or a paralegal) by adding plaintiff specific information and a summary of STB proceedings.  It would be unusual for a complaint's preparation to take more than 10 hours.  Plaintiffs seek nearly 70 times that.

Plaintiffs' overbilling begins with client solicitation efforts.  It is well-established that Plaintiffs are not properly reimbursed for client solicitation or development because such hours are dedicated to the law firm's benefit, not the benefit of the clients.  *See Campbell v. United States*, 138 Fed. Cl. 65, 71 (2018).  Reimbursement for such work violates the "cardinal rule[] in seeking an award of attorneys' fees under a fee-shifting statute that '[h]ours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority.'"  *Whispell*, 139 Fed. Cl. at 395 (quoting Hensley, 461 U.S. at 434, 103 S. Ct. 1933)

---

he did not disclose how any payments are made to this contractor or whether their bills were adjusted or reduced in any way.  ECF No. 209-2 at 6, Edwards Decl. ¶ 11.

(internal citations omitted). This court has denied reimbursement for time spent soliciting clients for this reason. *See id*. (disallowing nearly all hours Plaintiffs spent soliciting clients).

Here, Plaintiffs' counsel includes 677.60 hours (totaling $209,400) prior to October 26, 2015, when the complaint was filed, initiating this action. ECF No. 209-1. The only retention agreement that Plaintiffs produced, which is for Plaintiff John Arnold, is dated September 10, 2015. *See* Ex. A. And Mr. Edwards acknowledges that the earliest fee agreement is dated August 28, 2015.[12] ECF No. 209-2 at 3, Decl. of Deryl Edwards ¶ 4 ("Edwards Decl."). Yet, Mr. Edwards' billing entries that start on July 6, 2015, well before he had been retained by any Plaintiffs in this action. Such pre-retention work to secure clients does not constitute attorney fees payable under the URA.

Time spent prior to a lawsuit being filed is not properly reimbursed under the URA; it should not be included in any lodestar calculation. *See Otay Mesa Property, L.P. v. United States*, 124 Fed. Cl. 141, 147 (2015). Plaintiffs' counsel here drafted an extensive complaint with numerous exhibits and recitations of history; the 95-page complaint was unreasonably excessive. Plaintiffs contend that that their work was necessary to satisfy RCFC 11(b)(3) to ensure that they presented claims that had a "reasonable expectation of future evidentiary support." Tellingly, despite the suppose rigor of counsel's work, one third of the claims asserted failed.

Nor does extensive evidence need to be gathered and set out in the complaint. RCFC 8 only requires that a complaint contain a "short and plain statement of the grounds for the court's jurisdiction," "a short and plain statement of the claim showing that the pleader is entitled to

---

[12] The declaration later states that Mr. Edwards entered into his first agreement with an adjacent landowner on August 15, 2015, with many other landowners executing fee agreements at the public meeting he held. ECF No. 209-2 at 14, Edwards Decl. ¶ 41. Mr. Edwards does not identify this first landowner, so it is not known if it was a successful Plaintiff.

relief," and "a demand for the relief sought." Here, Plaintiffs' counsel could have utilized a standard complaint from a prior rails-to-trails case and had its contractor insert the case-specific information on Plaintiffs' properties and this railroad corridor. Then Plaintiffs' counsel could have reviewed the draft pleading, resulting in no more than two hours of time for the attorney and five hours of time for the contract paralegal.

Overall, the United States submits that the Court should deduct 669.50 hours for client solicitation and pre-complaint case development during the period before 2019 to arrive at a reasonable number of hours. *See also* Ex. C.

        2.     *Time devoted to unsuccessful claims and efforts is not reimbursable.*

Plaintiffs assert that they removed any charges for claims that were dismissed or were unsuccessful and, thus, does not seek compensation for those services. Pls.' Mem. at 26. Plaintiffs' counsel also asserts that the hours submitted were solely for work performed for the successful Plaintiffs and not related to any work incurred in any proceedings before the STB. ECF No. 209-2 at 3, Edwards Decl. ¶ 5. Yet, 10 of the original 27 claims were dismissed. Additionally, the billing entries include work for which Plaintiffs seek reimbursement that was unsuccessful. Plaintiffs' failure to make such a reduction in their fee application is improper under controlling circuit precedent. The elimination of these fees is therefore required.

It is well established in the context of fee-shifting statutes such as the URA that "hours spent on unsuccessful claims should be excluded from the lodestar amount where the claim or claims on which a plaintiff failed to prevail is 'distinct in all respects from his successful claims.'" *Bratcher v. United States*, 136 Fed. Cl. 786, 793 (2018) (citing *Hensley*, 461 U.S. at 440); *see also Biery v. United States*, 818 F.3d 704, 712 (Fed. Cir. 2016) (upholding the CFC's reduction of the hours for which plaintiffs' attorneys could claim reimbursement based on lack of success); *Hubbert v. United States*, 62 Fed. Cl. 73, 76 (2004) (same). Thus, "[w]hen calculating

29

a reasonable fee, a district court may exclude hours for work that do not 'contribute[] to any favorable result achieved by the litigation.'" *Outdoor Systems, Inc. v. City of Mesa*, 997 F.2d 604, 619 (9th Cir. 1993) (citation omitted).  That is a substantial part of the work performed in this action—at least 617.90 hours.

In addition to unsuccessful claims, Plaintiffs made several filings that were unsuccessful and unnecessary.  One example was the motion for partial summary judgment as to liability, discussed above, which the Court denied.  ECF No. 33.  One would expect Plaintiffs' counsel to use that motion to prepare the subsequent motion for partial summary judgment on title issues, but there is no evidence that occurred.  Plaintiffs' counsel still billed a large number of hours on the second motion.  In total, Plaintiffs billed 703.40 hours and $314,480 for work on their first two summary judgment motions and related briefing; 390.50 hours, totaling $174,887.50, were expended prior to the Court's Order denying the first motion on July 7, 2017, ECF No. 45.  ECF No. 209-1.  The Court should deduct all hours billed for the first unsuccessful motion and reduce time billed on the second motion to a reasonable amount.

Plaintiffs' counsel also billed significant time on summary judgment briefing on the issue of "state law abandonment."  ECF Nos. 107, 109, 115.  Plaintiffs expended 143.50 hours and charged $64,575.00 on this issue in 2019.  ECF No. 209-1.  This was never going to result in a resolution of the case or a finding of liability, as the *Arnold* Plaintiffs had acknowledged prior to the briefing.  ECF Nos. 26 at 7-8, 84 at 1-2, 105 at 1.  Ultimately, after the briefing was completed, the Court declined to even rule on this motion, which was mooted by the Court's entry of partial judgment on September 16, 2022.  ECF No. 197.

After eliminating the hours discussed above, the Court should make an across-the-board deduction of hours billed in the first phase of the case to account for work done on the 10 claims that were dismissed by July 6, 2018.  Thus, the United States proposes a 30% deduction for

30

hours through July 6, 2018, to account for Plaintiffs' unsuccessful claims and relative lack of success.

### 3. *Excessive and duplicative hours should be eliminated.*

The Court should reduce the number of hours for which Plaintiffs seek reimbursement to account for excessive and duplicative hours, particularly multiple people doing the same task. Plaintiffs bear the burden of proving that the number of hours submitted for payment is reasonable and does not include hours that are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434. Thus, courts should reduce the fee award where Plaintiffs' billing records reveal excessive hours spent on particular tasks, duplicative work by multiple attorneys, inefficiency, or hours spent on unnecessary work. *See id.*; *Fires v. Heber Springs Sch. Dist.*, 565 F. App'x 573, 575–76 (8th Cir. 2014) (upholding the reduction of a fee award based on excessive hours); *Hash v. United States*, No. 1:99-cv-324-MHW, 2012 WL 1252624, at *12-13 (D. Idaho April 13, 2012) (reducing duplicative hours under the URA in a Trails Act case); *see A.J. by L.B. v. Kierst*, 56 F.3d 849, 864 (8th Cir. 1995) ("A court may reduce attorney hours, and consequently fees, for inefficiency or duplication of services in cases where more than one attorney is used.").

A large percentage of the hours billed fall into this category. Even where such hours are recorded by timekeepers, these are the types of issues for which billing judgment is exercised and hours are reduced before sending a bill to a paying client. Here, hours "not properly billed to one's client are also not properly billed to one's adversary[] pursuant to statutory authority" and should be excluded. *Whispell*, 139 Fed. Cl. at 395 (quoting *Hensley*, 461 U.S. at 434). For instance, the almost 700 hours billed before this case was even filed does not show an exercise of billing judgment. Nor is it reasonable that a client would expect to pay counsel for work done before he retained that counsel. In the United States' attached exhibits, some billing entries have

been reduced by 50 or 75 percent, while others have been eliminated entirely to address duplicative entries for the same task.  *See* Ex. C.

It is worth re-emphasizing that Plaintiffs' claims were not complex.  There was one round of necessary summary judgment briefing to resolve discrete title issues.  The parties negotiated the dismissal of several claims, as well as the amount for just compensation and interest without the need for experts.  Nevertheless, Plaintiffs' fee request far exceeds anything requested by the plaintiffs' firms in almost identical cases on this same railroad corridor.  Additionally, Plaintiffs' counsel expended far more hours on simple tasks, like drafting or reviewing a status report and repeatedly researching the same rails-to-trails cases, than someone with his level of experience in this type of case.  *See* ECF No. 209-1.

Further, there are numerous entries where Mr. Edwards, Mr. Daniels, and the contractor paralegals who worked on this case, billed for communicating with each other, resulting in thousands of dollars for internal conferences and general communication.  Pervasive duplicative entries of this sort are unreasonable, particularly given the straightforward nature of this Trails Act litigation.  The duplication seen in Plaintiffs' billing records warrant a substantial write-down of the sort that would be applied in private practice before sending a bill to a paying client. The Court should reject reimbursement for 7.60 hours to account for entries that are primarily duplicative and for 370.70 hours to account for unreasonably excessive entries.

4.    *Wasteful and unnecessary hours should be eliminated.*

Courts may deny attorneys' fees for hours spent on "wasteful litigation efforts" because such fees "cannot be characterized as reasonable."  *Smith v. Bd. of Commissioners of La. Stadium and Exposition Dist.*, No. CV 17-7267, 2021 WL 6332245, at *4 (E.D. La. May 25, 2021), report and recommendation adopted, No. CV 17-7267, 2021 WL 6327709 (E.D. La. June 23, 2021); *see also Montanez v. Simon*, 755 F.3d 547, 555 (7th Cir. 2014) (upholding trial

judge's deductions of "wasted" time spent on "fruitless" legal research and drafting untimely

discovery requests). In the same way, Plaintiffs should not recover attorney's fees for

unnecessary work, i.e., work that was not completed to obtain a successful recovery of just

compensation. And, if a court determines that such wasted effort has occurred, it has the

discretion to simply reduce the proposed fee by a reasonable amount without an item-by-item

accounting. *Laborers' Int'l Union of N. Am. v. Brand Energy Servs.*, LLC, 746 F. Supp. 2d 121,

126 (D.D.C. 2010). This approach provides courts a "practical means of trimming fat from a fee

application." *Kirsch v. Fleet St. Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998).

 Work done in the second and third phases of this case was largely unnecessary. Given

the similar posture of this case to *Caquelin*, as well as the lengthy time between the expiration of

the NITU and the railroad's consummation of abandonment, the United States' request to stay

this case would have saved the parties from much wasted effort. In *Davidson v. City of Culver

City*, the court considered the fact that Plaintiffs' counsel refused to stay discovery pending the

court's ruling on a motion to dismiss, which significantly increased the city's attorneys' fees and

expenses associated with diverting city resources to the plaintiffs' discovery demands when the

court awarded attorneys' fees to the city. 2004 WL 5361891, at *16 (C.D. Cal. Sept. 20, 2004),

aff'd sub nom. *Davidson v. Culver City*, 159 F. App'x 756 (9th Cir. 2005) (finding "Because

Davidson and her counsel bear the responsibility for the unnecessary costs incurred by the

Culver City in defending this case, the Court exercises its authority under 42 U.S.C. § 1988 to

award the City its reasonable attorneys' fees . . ."). *See also Santa Fe Nat. Tobacco Co, Inc., v.

Spitzer*, 2002 WL 498631, at *4 (S.D.N.Y. March 29, 2002) (noting that defendants' refusal to

stay the case increased the cost of the litigation, which it considered in awarding a reasonable

attorneys' fee).

Plaintiffs' counsel in this case and those in the related cases, *Dawson* and *Flying S. Land Co.*, opposed consolidating the cases early on, arguing that their clients chose their individual attorneys to represent their interests.  So, instead of consolidating the cases, the Court put them on the same track and often included all of the parties from the cases for status conferences. Consolidation, particularly with one lead counsel, would have reduced the level of duplication of effort across these three cases and for each individual case.

There are numerous entries that involve motions for extensions of time, vague work assignments for Elite Consulting, and reviewing orders and other filings.  For instance, on November 15, 2016, Plaintiffs' counsel billed 4.80 hours for researching his objection to consolidation, including various cases, statutes, and regulations, along with shepardizing those cases.  ECF No. 209-1 at 26.  For instance, Elite Consulting has various entries that state "performing work assignments on case," "draft email to Office," or "review email from Office" without any ECF number or other information to show why the work was needed.  ECF No. 209-1 at 93.

Plaintiffs provide no explanation for any of these entries in their motion, so the Court and the United States is only left with the vague billing entries to examine these fees.   Without more, these entries should be deemed unnecessary to the successful prosecution of these cases, and along with the other unnecessary entries, 548.97 hours should be reduced from any recovery by Plaintiffs.  *See also* Ex. C.

> 5.    *Administrative work is not reimbursable.*

Plaintiffs seek reimbursement for administrative or secretarial work that is not recoverable under the URA.  The Supreme Court has explained that "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them." *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989).  The Court of Federal Claims has

34

consistently denied reimbursement for secretarial and administrative tasks as non-compensable

overhead costs. *See Bratcher*, 136 Fed. Cl. at 796 (reducing hours for tasks that were clerical or

secretarial in nature); *Biery v. United States*, Nos. 07-693L, 07-675L, 2014 WL 12540517, at *4-

5 (Fed. Cl. Jan. 24, 2014) (ruling that secretarial and administrative work is non-compensable).

Secretarial or administrative work includes, inter alia, tasks "such as proofreading, assembling,

photocopying, and mailing," *Hopi Tribe v. United States*, 55 Fed. Cl. 81, 99 (2002); *see also*

*Fang ex rel. Yang v. Sec'y of Human & Health Servs.*, No. 10-33C, 2013 WL 4875120, at *6

(Fed. Cl. Aug. 22, 2013) (deducting paralegal time spent on saving and filing order and placing

events on the calendar). Even if a paralegal performs such tasks under the guise of compensable

paralegal work, if the nature of the task is secretarial, it is non-compensable. *Lawrence v. Sec'y*

*of Human & Health Servs.*, No. 09-435V, 2013 WL 3146775, at *3–4 (Fed. Cl. May 28, 2013)

(deducting all hours billed as paralegal time that were in fact secretarial in nature).

There are numerous instances of administrative work done by both attorneys and

contractors throughout this fee request. For instance, there are innumerable entries of emailing

clients for documents, forwarding documents by email, and checking calendars for particular

dates. *See generally* ECF No. 209-1. In one example, Mr. Daniels block-billed 5.10 hours on

June 21, 2021, to "assemble and reformat billing records regarding services rendered in Arnold

v. US; reorder by task; ascribe ABA codes to services rendered and forward to legal counsel."

Instead of billing this time at $425 per hour, an administrative assistant could have done this

work to format the billing records. ECF No. 209-1 at 70. Such work is purely clerical.

Additionally, there was often confusion within this case as to which counsel was

representing which parties or which plaintiffs remained in the case, and the Court ordered one or

both of the parties to file a clarification on this issue. Often, these documents were prepared by

Mr. Edwards, expending far more than was reasonable or necessary to merely identify Plaintiffs

35

in this case.   For example, in a January 22, 2020 Order, the Court directed Plaintiffs to file a

chart showing who now owned the parcels in question.  ECF No. 118.  This issue had been

stipulated to by the parties on March 13, 2017, ECF No. 30, and then fully resolved in the

Court's April 10, 2018 ruling on summary judgment, ECF No. 77.  However, Plaintiffs' counsel

billed 12.70 hours for this simple filing, drafting a seven-page brief to accompany the chart

showing the relevant plaintiffs, ECF No. 119.

Overall, this work is not the sort that could be billed to a private client as attorney time or

even paralegal time, and it is not any more acceptable to obtain reimbursement for it from the

United States.  As such, the United States deducted 31.20 hours from Plaintiffs' total fees.  *See*

*also* Ex. C.

### 6. *"Fees on fees" claims should be reduced.*

The Court should substantially reduce the attorney hours for which Plaintiffs seek

reimbursement because the fees sought are not reasonably related to the recovery for Plaintiffs'

just compensation award.  Plus, the total fees grossly exceed the total just compensation.

Here, the parties reached an agreement as to just compensation in 2020, which eliminated

any incentive for Plaintiffs' counsel to exercise billing judgment and reduce fees because there

was an almost guaranteed opportunity to request reimbursement under the URA.  *Hensley*. 461

U.S. at 434.  Plaintiffs' counsel billed 91.80 hours for fees, mostly in 2022.  ECF No. 209-1.

Further, most of this work was completed by Mr. Daniels, who does not appear to have been as

familiar with rails-to-trails cases and precedents, so he spent a significant time researching and

reviewing the case.

This Court should use its discretion to reduce Plaintiffs' "fees on fees" recovery in this

case to an amount that is commensurate with the reasonable cost of litigating the same motion

that it has litigated elsewhere. The United States requests that Plaintiffs' requested hours be reduced by at least 50 percent to account for these unreasonable fees.

       7.    *Summary of reductions*

The Court should apply the above reasonable rates to the modified reasonable hours[13] to determine the maximum amount that Plaintiffs should be able to recover for reimbursement of reasonable attorneys' fees. The resulting lodestar is $65,012.16.

**C.    Plaintiffs are not entitled to reimbursement for unreasonable expenses.**

       1.    *Plaintiffs have failed to substantiate claimed expenses.*

To be eligible for reimbursement under the URA, Plaintiffs must first substantiate expenses and must then establish that they were necessary and reasonable. *See* 42 U.S.C. § 4654(c); *Oliveira v. United States*, 827 F.2d 735, 744 (Fed. Cir. 1987). The law requires adequate supporting documentation. *See R.C. Const. Co., Inc. v. United States*, 42 Fed. Cl. 57, 63–64 (1998) (finding that petitioner is entitled to recover expenses "assuming they are documented and reasonably necessary to [the] prosecution of the claim"); *Preseault*, 52 Fed. Cl. at 679 (documentation is required because "[w]ithout sufficient detail, a court is unable to determine whether the hours, fees, and expenses are reasonable for any individual item invoiced."). Plaintiffs have failed to provide supporting documentation for their expenses.[14]

None of the expenses that Plaintiffs seek are supported, except for the October 26, 2015 filing fee of $400.00 that initiated this action and a reduced amount of $63.35 for the chambers copy of the complaint, ECF No. 209-1. The United States identifies its specific objections to the expenses in Exhibit E, which is attached hereto.

---

[13] The modified hours and rates for each timekeeper who worked on this case are shown on Exhibit D, which is attached hereto.

[14] The billing entries provided for Elite Consulting, Inc. and McDowell Rice Smith & Buchanan PC in ECF No. 209-1 do not appear to be the monthly or regular invoices.

2.      *Unnecessary expenses are not reimbursable.*

Plaintiffs include copying, printing, and postage charges without any explanation as to why those expenses were necessary to the success of their claims.  These expenses should be included in the overhead for providing legal services and should not be reimbursable.  It has been made clear that "costs associated with administrative services 'are more appropriately charged to overhead' and should therefore be included within an attorney's hourly rate." *Otay Mesa*, 124 Fed. Cl. at 148.  These expenses total $2,367.95.

Plaintiffs also include $5,747.23 of expenses for pre-complaint travel that appears to have been for client development.  *See* ECF No. 209-1.  The expenses for this travel spanned from August 9, 2015, to September 12, 2015.  No travel was required in this case, and Plaintiffs provide no explanation that justifies reimbursement of these expenses.  Further, as discussed above, expenses for client development should not be reimbursed under the URA.  Thus, Plaintiffs have failed to establish that claimed expenses were necessary and recoverable.

3.      *Plaintiffs' expenses should also be reduced for unsuccessful claims.*

Plaintiffs' expenses should be reduced to account for unsuccessful claims.  Specifically, Plaintiffs bill $675.64 for undocumented expenses that the identify as related to the premature and unsuccessful summary judgment motion as to liability.  Plaintiffs also fail to show why these expenses are necessary, and thus, they should not be recoverable under the URA.

**D.     Plaintiffs' limited degree of success warrants an additional reduction of plaintiffs' fees.**

The disparity between just compensation and claimed attorney fees in this action is shocking.  This action should have been simple and straightforward:  first, determine if plaintiffs possess an ownership interest by obtaining and reviewing deeds; second, wait to see how negotiations between the railroad and potential trail sponsor conclude, *i.e.*, with or without a trail

use agreement; and third, determine just compensation if a delay in abandonment of the rail line was caused by the NITU.  Instead, Plaintiffs' counsel expended unnecessary hours for the most mundane tasks, billed those tasks at the rate of a senior attorney, opposed sensible efforts to reduce costs by staying proceedings to ascertain whether there would in fact be a trail use agreement, and filed pointless motions.  As a result, the Court is faced now with an attorney fee demand more than 193 times the Plaintiffs' judgment.  And as such, paying plaintiffs the sum demanded would plainly be unreasonable.  Even putting aside Plaintiffs' inability to establish that they owe their attorneys anything, such that they satisfy the URA's "actually incurred" requirement, the law gives the Court tools to avoid an unjust result here.

The Supreme Court has cautioned that if "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount."  *Hensley*, 461 U.S. at 436.  In line with the Supreme Court's guidance that the degree of success obtained is "the most critical factor," *id*., it is common practice for courts to reduce URA fee awards where a plaintiff ultimately recovers on some, but not all, claims.  *See, e.g., Stimson Lumber*, 154 Fed. Cl. at 706-09; *Gregory v. United States*, 110 Fed. Cl. 400, 404-06 (2013).  However, this is not the only meaning of "degree of success" in the context of fee awards:  courts have also relied on that instruction to reduce fee awards where plaintiffs recover only a small amount in comparison to the dollar amount they originally sought.  *See, e.g., Larsen v. A.R. Res., Inc.*, 453 F.Supp.3d 849, 856 (E.D. Va. 2020) (reducing the attorney fee by 50% to reflect the "low ratio of damages achieved to damages sought"); *MTX Commc'ns Corp. v. LDDS/WorldCom, Inc.*, No. 95-CIV-9569 (RO), 2001 WL 674142, at *2 (S.D.N.Y. June 15, 2001) (applying the "degree of success" standard to reduce an attorney's fee from approximately $500,000 to approximately $40,000 where Plaintiff recovered less than 10% of the damages sought).  Similarly, courts have also considered proportionality of

attorney fees to the results obtained when considering the parameters of a reasonable fee.  *See Moriarty v. Svec*, 233 F.3d 955, 968 (7th Cir. 2000); *Saizan v. Delta Concrete Products Co., Inc.*, 448 F.3d 795, 802-803 (5th Cir. 2006).

The Federal Circuit has authorized courts to use their discretion to depart from the lodestar in appropriate circumstances.  Citing Supreme Court precedent, the Federal Circuit affirmed that – although not routine – "adjustments to the lodestar figure 'are proper . . . [in] 'exceptional' cases."  *Bywaters I*, 670 F.3d at 1229 (quoting *Del. Valley*, 478 U.S. at 565).  This action – where counsel has had no incentive to exercise billing discipline and has litigated in a manner that dramatically increased litigation costs while obtaining no corresponding benefit for their clients – certainly qualifies as an exceptional case.  Given Plaintiffs' very limited degree of success and counsel's overall approach to this litigation, the Court should make a substantial reduction to the calculated lodestar of at least 75 percent.  Any greater award would be unreasonable.

## CONCLUSION

For these reasons, the United States respectfully requests that the Court deny Plaintiffs' request for reimbursement under the URA.

Respectfully submitted, this 3rd day of January 2023.

> TODD KIM
> Assistant Attorney General
> Environment & Natural Resources Division
>
>  */s/ Davené D. Walker*
> DAVENÉ D. WALKER
> DAVID HARRINGTON
> HANNAH O'KEEFE
> Natural Resources Section
> Environment & Natural Resources Division
> United States Department of Justice

P.O. Box 7611
Washington, DC  20044-7611
Telephone:  (202) 353-9213
Facsimile:  (202) 305-0275
E-mail:  davene.walker@usdoj.gov

Attorneys for the United States